Filed 6/7/23  A.D. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| A.D.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br><br>    Respondent;<br><br>SAN BERNARDINO COUNTY<br>CHILDREN AND FAMILY SERVICES,<br><br>    Real Party in Interest. | E080990<br><br>(Super.Ct.Nos. J295055 &<br>  J295056)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Lynn M. Poncin, Judge.  Petition denied.

Law Offices of Inez Tinoco-Vaca and Inez Tinoco-Vaca for Petitioner.

No Appearance for Respondent.

1

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Real Party in Interest.

In a prior dependency proceeding in Los Angeles County, petitioner A.D. (Mother) and C.F. (Father)[1] lost custody of their son, A.F. (born 2017), failed to reunify, and ultimately had their parental rights terminated. In the present case, the juvenile court removed A.F.'s younger sister, R.F. (born 2019), and half brother, B.D. (born 2022), bypassed reunification services for both parents under subdivisions (b)(10) and (b)(11) of the Welfare and Institutions Code[2] section 361.5, and set a selection and implementation hearing under section 366.26. Mother seeks review by extraordinary writ. Mother contends that the juvenile court's finding that Mother has not made a subsequent reasonable effort to treat the problems that led to removal of A.F. is unsupported by substantial evidence. In the alternative, Mother argues that if subdivisions (b)(10) and/or (b)(11) of section 361.5 are applicable, she presented clear and convincing evidence that reunification is in the best interest of the children under subdivision (c)(2) of section 361.5. For the reasons set forth below, we deny Mother's writ petition.

---

[1] Father, who is the father of A.F. and R.F., did not file a writ petition and is not a party to Mother's petition. The father of B.D. is unknown.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

## FACTUAL AND PROCEDURAL HISTORY

### A.      2017 LOS ANGELES COUNTY DEPENDENCY PROCEEDING

On September 29, 2017, a dependency petition was filed on behalf of A.F. in Los Angeles County. On November 15, 2017, the Los Angeles County Juvenile Court found true three of the petition's allegations:

"b-1 [¶] On 09/09/2017, the child [A.F.] was born suffering from a detrimental condition. Such condition consisted of a positive toxicology screen for methamphetamine at the child's birth. Such condition would not exist except as a result of unreasonable acts by the child's mother, [A.D.], placing the child at risk of physical harm and damage. The mother's substance abuse endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage and danger.

"b-2 [¶] The child [A.F.'s] mother, [A.D.], has a history of substance abuse and is a current abuser of methamphetamine and amphetamine which renders the mother incapable of providing regular care and supervision of the child. The mother abused illicit drugs during the mother's pregnancy with the child and had a positive toxicology screen for methamphetamine and amphetamine on 09/09/2017, at the child's birth. The child's father, [C.F.], knew of the mother's substance abuse and failed to protect the child. The child is of such young age requiring constant care and supervision and the mother's substance abuse interferes with providing regular care and supervision of the child. The mother's substance

3

abuse, and the father's failure to protect the child, endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage, [and danger].

"b-3 [¶] The child [A.F.'s] mother, [A.D.], and the father, [C.F.], have a history of engaging in violent altercations. On prior occasions, the mother and the father pushed and shoved each other. Such violent conduct on the part of the parents endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage and danger."

The Los Angeles County Juvenile Court sustained the petition, declared A.F. a dependent child of the court, removed A.F. from the custody of Mother and Father, and ordered reunification services to both parents. Reunification services for both parents were terminated on November 14, 2018. On November 6, 2019, the court selected adoption as A.F.'s permanent plan and terminated the parental rights of Mother and Father.

B.    CURRENT DEPENDENCY PROCEEDING

On November 12, 2022, San Bernardino County Children and Family Services (the Department) received an immediate response referral alleging caretaker absence/incapacity by Mother. A social worker responded to the emergency department at Loma Linda University Medical Center, where she met one-month-old B.D. and maternal aunts Teresa and Melissa. Maternal aunts explained that both Father and Mother were in jail, and Mother had arranged for Father's sister-in-law, Breanna, to care

for B.D. and R.F. in her absence. Breanna had called the maternal aunts two days before because B.D. was having trouble breathing, and they urged Breanna to take the baby to the hospital. The next day, when B.D. still had not been seen by a doctor, Teresa drove to Breanna's home and took B.D. to the hospital. He was diagnosed with a respiratory syncytial virus (RSV) infection. Upon B.D.'s discharge from the hospital, no family member was able and willing to care for him. Teresa stated that she was unable to take care of the children because she was already caring for five children and the maternal grandmother, who suffers from amyotrophic lateral sclerosis.

The social worker received a call from paternal aunt Breanna stating that she could no longer take care of the children because she and her husband were moving. Breanna told the social worker that R.F. was at the home of paternal aunt Carmen and provided the address. The Department determined that both children would be detained because they had no legal caregiver available, and the arrangements Mother had made for their care were no longer adequate.

The social worker visited Father in jail, where he was awaiting trial on charges of battery causing serious bodily injury (Pen. Code, § 243, subd. (d)), active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)), and violation of parole (Pen. Code, § 3056). Father stated that both he and Mother were arrested for the same incident, although Father was arrested a few weeks before Mother. Father said he could not post his $400,000 bail and would be going to trial. The social worker notified Father that R.F.

5

would be detained and provided notice of the detention hearing set for November 16, 2022.

The social worker visited Mother in jail, where she was awaiting trial on charges of battery causing serious bodily injury (Pen. Code, § 243, subd. (d)), active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)), and criminal threats (Pen. Code, § 422).  Mother stated that she was arrested October 31, 2022, on " 'false charges,' " and was unable to post bail of $450,000.  Mother was provided notice of the November 16 detention hearing.

Mother requested that the children be placed with their maternal great aunt Delia. Father also stated that Delia's home would be a good placement.  The Department took both children into temporary custody and placed them together in the home of maternal great aunt Delia.

On November 15, 2022, the Department filed section 300 petitions on behalf of the children alleging they were at risk of harm or neglect due to both parents' criminal activity and Mother's substance abuse, that both parents are incarcerated and cannot arrange for the children's care, and that in the sibling dependency proceeding both parents had failed to reunify and had their parental rights terminated.  Both parents were still in custody and transported to juvenile court for the detention hearing on November 16.  The court detained the children and set a combined jurisdiction and disposition hearing, which was set for contest and continued several times.

When interviewed for the jurisdiction/disposition report, Mother stated that she had been arrested for being in the wrong place at the wrong time. She said that she has been in an on-again-off-again relationship for roughly the last six years with her boyfriend, Father. They were living together with the children at an apartment complex in Adelanto. A neighbor at the apartment complex had accused her of assault, which was not true. Mother also denied that Father had been involved in any fight with the neighbor and denied that he was in a gang. She said Father has " 'a lot of tattoos and looks a certain way where people judge him.' " She said Father had recently been released from prison, had obtained employment, and they were doing " 'good.' " She denied any use of physical discipline with the children by either her or Father and said that there is always enough food to eat, and the utilities are always on.

Mother reported that her older child, A.F., was adopted by maternal grandmother. Mother said that A.F. had tested positive for methamphetamine at birth, child protective services became involved, and she lost her parental rights. Mother reported that she first used meth at age 16 and was a daily user by age 18. Mother stated that she has not used any drugs since completing an inpatient treatment program " 'a few years ago.' " She denied any drug use by Father and said they both drink alcohol occasionally.

Mother stated that she and Father get along " 'good' " and denied there was any domestic violence. She disagreed with the allegation that the termination of her parental rights over a sibling places the children at risk of abuse or neglect because A.F.'s case was due to her use of substances, and she does not use drugs anymore.

On January 18, 2023, the Department filed with the juvenile court the police report of the September 29, 2022, incident and minute orders from the preliminary hearing in the parents' criminal cases. According to the report, sheriff's deputies responded to a call of an assault with injuries at the apartment complex where the parents were residing. Deputies found the victim incoherent and crying, with "blood spatter all over her face and on the grey sweater [she] wore. [Her] entire face was swollen, with major swelling on her upper right eyebrow, cheek bone areas and lips. [She] had pink in her eyes and multiple lacerations on the right side of her face. [Victim] was transported by [ambulance] to Victor Valley Global Medical Center for her injuries." The victim said that five people attacked her, her hair was pulled out in multiple areas, and she had been kicked and punched in the face and head repeatedly. The victim reported that before the attack, she had asked some people leaving a party in the complex to pick up their trash. A resident named Elijah reportedly felt disrespected by her request and became very angry, saying this was his " 'hood' " and something about Pomona, then started punching the victim. Another resident tried to help the victim return to her apartment, but Elijah grabbed the victim by her hair and dragged her from her apartment door down to the parking lot, where he and others attacked the victim. The report states that a woman "later identified as [Mother], who is a neighbor in apartment number 18, kicked [the victim] an unknown amount of times," and that Father "was striking [the victim] by unknown means." The victim later picked Mother, Father, and two other residents of the complex out of photo lineups and identified them as her attackers. Father was arrested on

8

October 13, but Mother was not taken into custody at that time because she was caring for two young children, including B.D. who was only a few days old.

On December 20, 2022, after the victim had testified at the preliminary hearing, Mother and Father each pled no contest to a single felony count of assault by force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)). Father also admitted that he had one or more prior serious felony convictions (Pen. Code, § 1170.12). The remaining charges and allegations were dismissed pursuant to their plea agreements. Mother was granted two years of formal probation with a custody term of 101 days in county jail, which was satisfied by time served. Father remained in custody with sentencing set for January 31, 2023.

In the Department's January 18, 2023, report to the court, the Department acknowledged that Mother was no longer in custody and that she had tested negative for all substances on January 6, 2023. The Department therefore amended its recommended jurisdictional findings and asked the court to find not true the allegations concerning Mother's substance abuse and incarceration.

On January 31, 2023, during a Child and Family Team Meeting, the children's caregiver requested services for R.F. because "she had heard statements from the child relating to the parents engaging in domestic violence." The caregiver reported that R.F. had mimicked " 'daddy hitting mommy' " and R.F. went on to say, " 'daddy hit mommy' and 'mommy fall and mommy cry.' "

9

Mother was interviewed again and asked about the September 2022 incident that led to her and Father's arrests. Mother stated that she and Father had been hanging out at the pool that day, along with their codefendants, Kiara, whom mother described as " 'a family friend,' " and her brother, Elijah. Mother acknowledged that the victim had " 'pointed [her and Father] out' " as having attacked her, but Mother stated she and Father " 'were not involved.' " Mother reported that Kiara and Elijah had been drinking, but she and Father were not. Mother further stated that she was eight months pregnant at the time, that she and Father were both identified as attackers by the victim, and that their two codefendants were friends of theirs, but Mother again denied that either she or Father had any involvement in the violence. Mother also stated that she was not drinking that day because she was eight months pregnant with B.D., and she denied that Father was drinking.

When the social worker addressed the sibling dependency case, Mother stated that was only due to her substance abuse. When the social worker explained that in addition to substance abuse, there was another sustained allegation that Mother and Father had a history of engaging in violent altercations and read that allegation to her, Mother did not acknowledge that to be true. The social worker tried to explain that the history of violence reported in the sibling case and the violence that was reported in the present case were troubling because the violence was occurring around the children and putting them in danger. Mother became very defensive and asked to speak to a supervisor so she could request that a new social worker be assigned to the case.

10

On February 22, 2023, the Department filed first amended petitions for both children with additional allegations that Mother and Father "engage[] in ongoing violent activity" that endangers the children. The new allegations specifically refer to the sibling dependency case in which the court had found true that the parents had a history of engaging in violent altercations that endangered the child, and also referred to both parents' December 2022 convictions for assault by means of force likely to produce great bodily injury. The Department filed a report explaining the amendments to the petitions and attaching the records from the 2017 sibling dependency case.

On March 29, 2023, the juvenile court held the further contested combined jurisdiction and disposition hearing and heard testimony from Mother and from the social worker. Mother understood that the Department's recommendation was to deny her reunification services. She acknowledged the 2017 dependency proceeding regarding A.F. and stated that he had been removed from her custody due to Mother's "substance abuse problem and also domestic violence." Mother also acknowledged that she was provided reunification services in the Los Angeles dependency case, those services were terminated, and her parental rights with respect to A.F. were terminated. Mother testified that in connection with the 2017 sibling dependency case, she had started a domestic violence program but did not complete it.

Mother understood that the Department's recommendation to deny her services was based in part on her previous denials and her lack of honesty in refusing to acknowledge that she and Father had a history of domestic violence that, in addition to

11

her substance abuse, was another problem that led to A.F.'s removal. Mother stated that she and Father were involved in a relationship at the time of the sibling dependency case and that their relationship did involve domestic violence. Mother stated that she and Father had ended their relationship sometime after the sibling dependency case around December 2021, but they continued to share the apartment together until Father's September 2022 arrest, because the lease was in both of their names. Since the lease ended in October 2022, Mother's only relationship with Father has been co-parenting R.F., although Mother conceded on cross-examination that she continued communicating with Father after his arrest and sent him pictures, including while she was in custody.

Mother stated that the only domestic violence incident with Father had occurred "around 2017," and there had not been any domestic violence in the years since. She acknowledged that Father was incarcerated in state prison for 13 months of that period, from May 2021 through June 2022. Mother explained that she did not recognize the domestic violence in her relationship with Father until her recent participation in the domestic violence program where she heard other women talking about their experiences which prompted her to realize that she had experienced domestic violence as well. Mother felt that the domestic violence program was benefitting her.

Mother also admitted that she was abusing methamphetamine at the time of the 2017 sibling dependency case, but she stated she does not have any issue with substance abuse today. Mother testified that she completed an inpatient substance abuse treatment program and has not used since then. Mother submitted to random drug testing for the

12

Department in the present case and has tested negative. Mother felt that the treatment program helped her with her drug abuse.

Mother testified that she was 19 years old when she lost custody of A.F. When asked why she did not complete her services in the 2017 sibling case, Mother said she felt the need to move away from Los Angeles County to get out of the environment where she had engaged in her substance abuse. Mother also said that with "everything that was going on and moving and stuff, [she] . . . just kind of, like, lost track." Mother then said she believed it was the domestic violence program that she had failed to complete because she had to pay for those classes out of pocket and was not working at the time.

Mother testified that she was consistent in her visitation with the children, and the only time she missed a visit was when B.D. was infected with COVID. Mother enjoyed seeing the children and would sometimes bring paints or do activities with them.

Under cross-examination, Mother denied being directly involved in the September 29, 2022, altercation that led to her and Father's arrests. Mother said there was a fight between the victim and another resident named Kiara. Mother said that she "tried to separate" them to break up the fight, but that made it look like Mother was "in it too." Mother then stated: "I completely understand that I was there when I wasn't supposed to be there[,] and I take blame for my criminal behavior." When pressed to explain how her actions constituted criminal behavior, Mother said it was "being at the wrong place at the wrong time" and "just being around, like, people I'm not supposed to be around." Mother further stated: "I kind of got in the middle so I feel like I had part of

13

it 'cause I tried to stop it, but I got in the middle of it." Mother also denied that Father had taken part in the September 29 fight.

Mother testified that in the present dependency proceeding, she completed a 12-hour parenting program on February 14, 2023, for which she submitted a certificate of completion, enrolled in a domestic violence program in early March 2023 and completed five classes, and started therapy which was scheduled for every other week and completed her first session the week before the hearing. Mother stated that she was unable to get referrals to these services from the social worker and had to contact the probation department and Medi-Cal to find services she could access. Mother said the social worker told her from the beginning that the Department was going to recommend against reunification. Mother said the social worker was not communicating with her and would not return her calls. Only after Mother complained to a supervisor did the social worker call Mother "upset and . . . screaming at me," "she said I wasn't complying," "[a]nd then she kind of just hung up on me."

The social worker testified that she had conducted two interviews with Mother; one while she was in custody and the other after she was released. At the first, they discussed Mother's background and the allegations in the petitions, but they did not discuss the Department's recommendations because they were waiting for law enforcement records. At the second interview, the social worker gave Mother a community resource packet that included a list of available free services like parenting classes, domestic violence programs, drug treatment, housing, and other assistance. The

14

social worker had not yet received the law enforcement records, so the recommendations were not discussed at that meeting either.

The social worker had concerns given Mother's history, that after failing to reunify in the sibling case, Mother was denying any kind of domestic violence or that it played any role in the prior case, and then was involved in a violent altercation while she was pregnant. The social worker did not feel that Mother had addressed her issues with domestic violence because at the first interview, Mother denied any domestic violence, and at the second, Mother refused even to acknowledge that domestic violence was alleged in the sibling dependency case. The social worker opined that Mother's "not acknowledging what happened regarding her arrest, not acknowledging the domestic violence with father," despite Mother having had time since the sibling case "to benefit and show change, . . . I believe that places the children at risk."

The social worker also testified that in her final telephone conversation with Mother in February 2023, mother became upset, and "[t]he call was terminated not by me but by mom, and after that she requested a new social worker."

The social worker also testified that in her view, ending a domestic violence relationship is "a good start," but is not sufficient to resolve the issue. That requires "education, recognizing what domestic violence is, how it has an impact on children, and also just acknowledgement . . . which I did not get from mom . . . until this hearing."

Finally, the social worker did not believe that Mother's testimony regarding the September 29 altercation accurately described her involvement, which was described in

the police report as a five-person attack on a single victim who picked Mother out of a lineup, "a very bloody incident" that Mother participated in while she was pregnant.

The juvenile court dismissed without prejudice the allegation concerning Mother's substance abuse (designated as b-2 on both petitions) and the allegation concerning Mother's incarceration (designated as g-4 on B.D.'s petition and as g-6 on R.F.'s petition), found true as written all of the remaining allegations in the first amended petitions, declared both children dependents of the court, and ordered them removed from the custody of Mother, Father, and all unknown fathers. After considering argument from all counsel, the court found by clear and convincing evidence that section 361.5, subdivisions (b)(10) and (b)(11), applied, and that Mother had not shown by clear and convincing evidence that reunification would be in the best interest of the children under subdivision (c)(2). The court denied reunification services to both parents and set a section 366.26 hearing for July 27, 2023.

The court first described in detail how Mother's testimony "differs greatly" from other testimony and evidence in the record, including discrepancies between Mother's account of trying to break up the September 2022 fight and the victim's account in the police report, Mother's testimony regarding her last phone call with the social worker in February 2023 which was contradicted by the social worker's February 23, 2023, report, and Mother's claim that the domestic violence with Father had not recurred since 2017 yet R.F., who was born in December 2019, has a recollection of violence between Mother and Father. The court concluded that Mother "was not honest and truthful and open"

16

about her history of violence with Father, its role in the 2017 sibling dependency, or her participation in the violent assault on a neighbor for which she was convicted. The court found that to the extent Mother's testimony differed from the social worker's reports, the social worker was "more credible in her recounting of [Mother's] prior statements."

The court acknowledged that Mother had addressed her substance abuse problems by completing a treatment program and participating in aftercare. Mother had started a domestic violence program back in 2019 but failed to complete it, then did not take any steps to address the "violent altercations involving herself and [Father]" until "a few weeks prior to this contested hearing." The court concluded that clear and convincing evidence established that Mother "has not subsequently made reasonable efforts to treat the problems that led to the removal of the [children's] sibling or half-sibling."

Addressing section 361.5, subdivision (c)(2), the court found that there had been no testimony regarding whether reunification would be in the children's best interest "other than how the visits are going for the mother and children," which does not rise to the level of clear and convincing evidence that reunification would be in their best interest, "especially given the fact that [R.F.] is recounting domestic violence that she saw between her mother and her father."

## DISCUSSION

Mother contends that substantial evidence does not support the juvenile court's finding that Mother "has not subsequently made a reasonable effort to treat the problems

17

that led to removal of" the children's sibling and half sibling, A.F. (§ 361.5, subds. (b)(10)(A) & (b)(11)(A).) We disagree.

When a child is removed from parental custody under the dependency laws, the juvenile court is generally required to provide family reunifications services. (§ 361.5, subd. (a).) The provision of reunification services aims to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) The statutory framework also furthers the legislative goal "that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) "Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. [Citation.] Specifically, section 361.5, subdivision (b), exempts from reunification services ' "those parents who are unlikely to benefit" ' from such services or for whom reunification efforts are likely to be 'fruitless.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120 (*Jennifer S.*).) If the court finds that one of these exceptions, commonly referred to as bypass provisions, applies, " ' "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]" ' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*).)

18

Specifically, section 361.5, subdivision (b)(10)(A), provides that a court may deny services if there is clear and convincing evidence: "That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent . . . and that, according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent." (§ 361.5, subd. (b)(10)(A).)

Similarly, subdivision (b)(11)(A) provides that the court may deny reunification services to a parent if it finds by clear and convincing evidence that the parent's "parental rights . . . over any sibling or half sibling of the child had been permanently severed, . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." (§ 361.5, subd. (b)(11)(A).)

Once the juvenile court determines that either subdivision (b)(10) or (b)(11) applies, it "shall not order reunification for [the] parent . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) In other words, "section 361.5, subdivision (c), provides that *denial* of reunification services is *mandatory*, not discretionary, with respect to nearly all of the bypass provisions, unless the court makes certain countervailing factual findings." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.) "The burden is on the parent to . . . show that

19

reunification would serve the best interests of the child." (*William B*., *supra*, 163 Cal.App.4th at p. 1227.)

"We review an order denying reunification services under subdivision (b) of section 361.5 for substantial evidence. [Citation.] Under such circumstances, we do not make credibility determinations or reweigh the evidence. [Citation.] Rather, we 'review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings.' [Citation.] In doing so, we are mindful of the higher standard of proof required in the court below when reunification bypass is ordered." (*Jennifer S*., *supra*, 15 Cal.App.5th at pp. 1121-1122.) Where the juvenile court made a finding by clear and convincing evidence, we "must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B*. (2020) 9 Cal.5th 989, 1005.)

It is undisputed in this case that: A.F. is the sibling of R.F. and the half sibling of B.D., A.F. was removed from Mother's custody and declared a dependent of the Los Angeles County Juvenile Court on November 15, 2017, reunification services were ordered terminated by that court on November 14, 2018, because Mother failed to reunify with A.F., and Mother's parental rights over A.F. were permanently severed on November 6, 2019. Mother challenges the juvenile court's finding that she has not subsequently made a reasonable effort to treat the problems that led to A.F.'s removal.

20

Mother contends that A.F. was removed due to her substance abuse and domestic violence, whereas R.F. and B.D. were removed due to her arrest and conviction for assault by means of force likely to produce great bodily injury. Mother avers that she had addressed the problems that led to A.F.'s removal because she no longer has a substance abuse problem, and she ended her relationship with Father.

"The reasonable effort requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation.] 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted." ' [Citation.] However, '[t]he "reasonable effort to treat" standard "is not synonymous with 'cure.' " ' [Citation.]" (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*).) "We do not read the 'reasonable effort' language in the bypass provisions to mean that *any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made. [¶] Simply stated, although success alone is not the sole measure of reasonableness, the *measure* of success achieved is properly

21

considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*Id.* at pp. 914-915.)

We find ample evidence supports the juvenile court's finding that Mother has not subsequently made a reasonable effort to treat the problems leading to A.F.'s removal. We recognize that Mother has apparently overcome her methamphetamine addiction and maintained her abstinence from drugs since completing an inpatient treatment program. Once Mother was released from custody, submitted to random drug testing, and tested negative, the Department promptly recommended that the court find not true the petition's allegations that the children were at risk due to Mother's incarceration and substance abuse. The court dismissed those allegations and appropriately acknowledged that Mother had completed drug treatment, participated in aftercare, and "has clearly overcome" her substance abuse problem. Without in any way diminishing Mother's achievement with regard to her methamphetamine addiction, that alone does not constitute a reasonable effort to treat the problems that led to A.F.'s removal, because the removal was also due to the failure to protect A.F. from "violent altercations" involving Mother and Father that "endanger[ed] the child's physical health and safety, and place[d] the child at risk of serious physical harm, damage and danger."

Mother's attempt to characterize the September 2022 assault as somehow different from the domestic violence that was a concern in A.F.'s 2017 dependency is unpersuasive. The danger to a child is the same regardless of whether the child is exposed to domestic violence between Father and Mother or is placed at risk because

Father and Mother are coordinating the infliction of violence upon a third person. The evidence showed that Mother, along with Father and at least two others, engaged in a bloody, unprovoked attack on a neighbor that resulted in significant injuries just a few days before giving birth to B.D. Although Mother testified that she was attempting to break up the fight, the court did not have to believe her account, which stood in stark contrast to the victim's report identifying Mother as having kicked her repeatedly while three others were punching, striking, kicking her in the face, and pulling out her hair.

The juvenile court had ample basis for its express adverse credibility finding against Mother. As the court pointed out, Mother's testimony was contradicted again and again by the Department's contemporaneous reports, by the law enforcement records in her criminal case, and by the testimony of the social worker which the court found to be more credible. Although Mother contends that she had ended her relationship with Father in December 2021 and that terminating that relationship was a reasonable effort to address their history of domestic violence, they continued living together with the children after Father was released from prison until he was arrested again for the September 2022 assault. Mother conceded that she continued writing to Father and sending him pictures even after her arrest on October 31, 2022. In addition, Mother's testimony that there had been no domestic violence with Father since 2017 was belied by R.F., who the caregiver reported was reenacting scenes of " 'daddy hitting mommy' " and was heard to say, " 'daddy hit mommy' and 'mommy fall and mommy cry.' " In light of Mother's continued denial and minimization of domestic violence, the juvenile

23

court properly concluded that Mother's belated enrollment in a domestic violence program just a few weeks before the contested hearing "was simply too little, too late." (*R.T.*, *supra*, 202 Cal.App.4th at p. 915.)

Finally, Mother argues that she presented clear and convincing evidence that reunification is in the children's best interest under section 361.5, subdivision (c)(2). We disagree. As the juvenile court pointed out, no testimony on this issue was presented at the hearing, other than Mother's testimony that she had been consistent in her visitation with the children and was not aware of any issues regarding those visits. Mother argues that reunification is in the children's interest because she was successfully able to parent R.F. for two and a half years without the Department's involvement and without any evidence that "the children were at risk under her care." The argument overlooks the caregiver's report in February 2023 that R.F. was heard mimicking " 'daddy hitting mommy' " and saying " 'daddy hit mommy' and 'mommy fall and mommy cry' " which indicates that R.F. had witnessed domestic violence between Mother and Father. In light of the child's exposure to domestic violence and Mother's continued denial and minimization, her consistent visitation with the children is inadequate to establish by clear and convincing evidence that reunification is in the children's best interest.

## DISPOSITION

The petition for extraordinary writ is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:


McKINSTER _____
Acting P. J.


MENETREZ _____
J.